IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Penn, LLC, et al.,                    :

      Plaintiffs,                 :

    v.                                :    Case No. 2:10-cv-993

Prosper Business Development          :    JUDGE GREGORY L. FROST
    Corporation, et al.,
                                           Magistrate Judge Kemp
      Defendants.                 :


<u>OPINION AND ORDER</u>

    This case is before the Court to resolve a discovery
dispute.  Plaintiffs Penn, LLC ("Penn") and Big Research, LLC
("Big Research") brought this action against Defendants alleging
various claims, three of which have survived the dispositive
motions decided thus far: breach of fiduciary duty, conversion,
and unjust enrichment.  The remaining defendants are Prosper
Business Development Corporation ("Prosper"), Phil Rist, and Gary
Drenik.  Following a series of status conferences regarding the
parties' discovery disputes, Plaintiffs filed a motion to compel.
The motion has been fully briefed.  On July 27, 2012, the Court
held an evidentiary hearing concerning Plaintiffs' motion, and
Plaintiffs and Defendants have each filed a post-hearing brief.
For the following reasons, the motion will be granted in part and
denied in part.

I.

    By way of general background, the parties to this case were
all involved in the business and winding down of Plaintiff Big
Research, which was a market research company using "online
interactive research techniques." (Pls.' Mot. Compel, Exh. 1A.)
Penn and Prosper formed Big Research in 2000. (Pls.' Mot. Compel

at Exh. 1.)  Although the owners and ownership percentages have changed over time, initially Penn and Prosper were the only two members, each owning 50% of Big Research.  (Id. at §1.02 & Exh. 1A.)  The Big Research Operating Agreement provided that the day-to-day business and affairs of the company would be managed by Prosper and that Penn would contribute its e-mail subscriber network.  (Pls.' Mot. Compel, Exh. 1 at §5.02 & Exh. 1A.) Defendants Mr. Drenik and Mr. Rist are the owners of Prosper and Prosper Technologies, LLC, and they are two of the three Big Research Board Members.

Over time, the relationship between Penn and Prosper became strained, and the parties have sought to resolve various issues in court and in arbitration.  One significant result of those proceedings was an arbitrator's determination that Penn was improperly divested of its 47% ownership interest in Big Research, and an award that directed Prosper to pay Penn based on a number of years when Prosper operated Big Research for Penn's sole benefit.  After the date of that award, Prosper continued to operate Big Research for several years, but ultimately wound down its operations and purchased Big Research's assets.

Penn filed the present action on behalf of itself and derivatively on behalf of Big Research for restitution and damages.  Penn alleges that Defendants improperly transferred and diverted business opportunities, assets, and revenues of Big Research to Prosper, and that these improper transactions happened both when Big Research was still operating, and in connection with the purchase of Big Research's assets and the transfer of its remaining business to Prosper.  The discovery at issue was intended both to identify questionable financial dealings and to quantify their impact on Big Research and on Penn's interest in that company.

II.

The procedural history of the current discovery dispute reflects a prototypical negotiation where one party initially demands "everything," and the other party initially refuses to provide anything, followed by a series of negotiated or court-ordered concessions.  At this point, several disputes remain. The document requests at issue in Penn's motion are listed in a table set forth in that motion and include requests from Penn's Second Request for Production to Prosper, Big Research's First Request for Production to Prosper, Penn's Request to Inspect Big Research, and Penn's Request to Inspect Prosper.

On March 27, 2012, following the issuance of the discovery requests at issue, the Court signed the parties' agreed protective order, which provided protections to certain documents that the parties designated as "Confidential" or "Attorneys Eyes Only."  According to the protective order, "Attorneys Eyes Only Materials shall not be disclosed to any person other than those identified in paragraphs 8.a., c., e., f., and g."  (Agreed Protective Order (Doc. 100) at ¶ 9.)  Paragraph 8.a. provided that disclosure would be permitted to "specially-retained consultants who are participating in or providing services for the prosecution or defense of this matter, provided, however that such consultants . . . to whom such access is permitted shall, prior to such access or disclosure, be advised of the provisions of this Order and shall be instructed to comply with it."

Pursuant to the parties' request, the Court held a discovery status conference on April 2, 2012.  At that conference, Plaintiffs argued that they needed access to all the financial and accounting records of Big Research and Prosper and related Prosper entities.  (4/2/12 Tr. (Doc. 103) at pp. 2-3.)  The Court asked why there would be any resistance to making Big Research's financial records from September 2008 (the date of the

-3-

arbitration award) forward available to Penn since the arbitrator had confirmed that Penn was and is a member of Big Research. (Id. at 22.)  Defendants agreed that those records should be made available to Penn.  (Id. at 23, 29-31, 33.)  Defendants also agreed to produce data from 2008 through 2011 reflecting all of the revenue received by Prosper from the types of surveys that both Big Research and Prosper conducted.  (Id. at 37-42.)  The Court also decided that discovery ought to be produced regarding the email list that all parties acknowledged was an asset of Big Research.  (Id. at 53.)  The Court suggested tabling the remaining questions – including what other Prosper records, if any, should be provided – until the Big Research records had been reviewed.  (Id. at 31-32, 55.)

Plaintiffs had their financial consultant, Rebekah Smith, review certain documents that Defendants produced following the status conference.  On May 1, 2012, Ms. Smith, wrote a letter to counsel for Plaintiffs in which she summarized her preliminary observations based on the records she had reviewed, and listed the records she needed to see from Big Research and the records she needed to see from Prosper and the related Prosper entities. (Pls.' Mot to Compel at Exh. 3B.)

On May 2, 2012, the Court held another status conference to address the discovery issues that had been tabled at the previous conference.  From Plaintiffs' perspective, the documents that had been produced up to that point supported their need for additional discovery from Prosper and the related Prosper entities because there was commingling of finances between those entities and Big Research.  (5/2/12 Tr. (Doc. 108) at 2-6.) After hearing from Defendants, who were not willing to produce additional documents without a more specific showing of why they were relevant, the Court concluded that it needed both parties to set forth with clarity and precision their positions and the

-4-

specific impasses that needed resolution.  (Id. at 12.)  In an
order following the conference, the Court summarized its rulings
as follows:

> The Court therefore directed plaintiffs' counsel to
> compile a complete list of additional items they are
> requesting, and to provide that list along with
> justification for their requests, to defendants'
> counsel by May 23, 2012.  Within fourteen days
> thereafter, counsel shall meet and confer concerning
> these matters.  As soon as the meet and confer is
> scheduled, counsel will notify the undersigned, and a
> status conference will be scheduled not later than
> seven days after the parties meet and confer.

(Doc. 107.)

According to Ms. Smith's testimony, her May 1st letter was
provided to counsel for Defendants in mid-May.  (7/27/12 Tr. at
31:14-17.)  On May 23, 2012, Ms. Smith wrote another letter to
counsel for Plaintiffs in which she offered what she
characterized as an "update," which included a summary based upon
her review and which identified additional documents needed.
(Pls.' Mot to Compel at Exh. 3C.)  She testified that she
intended for that letter to provide "specific examples of why
[she] had requested the six categories of [Prosper] documents
that [she] had requested in the May 1st letter." (7/27/12 Tr. at
32:14-17.)  She further testified that her May 23rd letter "is
[her] summary of the expenses and the fees charged by Prosper
Business Development Corp, Prosper Technologies and Prosper
International to BIGresearch." (Id. at 33:3-6.)

On June 18, 2012, the Court held another status conference.
It quickly became apparent that significant disputes about
document discovery persisted and that they could not be resolved
short of formal motions practice.  Four days later, as directed
by the Court, Plaintiffs filed their motion to compel.  On July
27, 2012, the Court held an evidentiary hearing.  The evidence

presented at that hearing is summarized below.

III.

At the evidentiary hearing, Plaintiffs called one witness: Rebekah Smith, CPA/CFF, CVA, CFFA, who is a Director and Member of GBQ Consulting, LLC. She testified that she has credentials that relate to forensic accounting and the valuation of closely-held businesses and has done consulting work regarding the valuation of closely-held companies and in the field of forensic accounting. She was hired by Plaintiffs to examine financial matters including valuation, accounting, and damages, and to advise Plaintiffs. She testified that she has an engagement letter with Penn, she received a retainer, she has been billing Penn for her work, and Penn has paid her.

Ms. Smith testified that she does not compete with Prosper in any way. (7/27/12 Tr. at 49:23-25.) She did not know Prosper, Penn, Mr. Drenik or Mr. Rist prior to her retention as a consultant for Penn. (Id. at 65:17-23.) She has previously been entrusted with sensitive and proprietary information of her customers and their competitors and has maintained safeguards in each of those instances. (Id. at 50:1-9.) She has confidentiality standards to which she must adhere, she understands the requirements of the protective order in this case, and she had already signed the agreement to be bound by the Agreed Protective Order in this case. (Id. at 113:18-114:14.)

At the time of her testimony, Ms. Smith had only been able to look at the books and records of Big Research and not of Prosper or any of the other entities related to Prosper. Ms. Smith identified three topics that she was investigating: (1) the value of the assets of Big Research that Prosper acquired in mid-2010; (2) the value of the corporate opportunities of Big Research that were obtained by Prosper; and (3) the accuracy and reasonableness of fees and charges between Big Research and

-6-

Prosper.

## A.  Valuing Assets Acquired by Prosper

Regarding the first topic – the value of the assets of Big Research – Ms. Smith testified that the books and records of Big Research reflected two journal entries for Prosper's purchase of Big Research's assets: one for approximately $13,000 for Big Research's "email list" and one for approximately $30,000 for Big Research's equipment.  Ms. Smith testified that Big Research also had assets such as contracts, customer good will, customer relationships, name and reputation, and, perhaps, business processes.  Although there is no formal record showing that these assets were actually purchased or acquired by Prosper, it is undisputed that Prosper essentially took over Big Research's business, and if Prosper acquired these additional assets for no consideration, that would impact Penn as a part-owner of Big Research.  In order to explore this topic further, Ms. Smith testified that she would need to review additional documents to determine (1) whether Prosper paid a fair price for the assets that it did purchase (the email list and equipment); and (2) what net revenue was generated from the other Big Research assets that Prosper did not pay for but that appear to have been acquired by Prosper.

For example, during her direct examination, Ms. Smith testified that it appeared that certain revenue streams that had been recorded as Big Research revenues were transferred to Prosper in mid-2010, and that those revenue streams were in excess of $200,000 in the last six months of 2010 alone.  The size of the revenue streams that were transferred to Prosper raised a red flag for Ms. Smith as to whether the purchase price that Prosper paid for Big Research's assets fairly reflected the value of those assets.  She testified that the only way for her

to determine the net revenue that Prosper received from those revenue streams would be to look at Prosper's books and records in order to identify the total gross revenue that Prosper received from its use of these assets and to identify the expenses associated with producing that income stream.  Ms. Smith will be unable to value these assets unless she can determine Prosper's net return on Big Research's assets.

  B. <u>Valuing Big Research's Corporate Opportunities</u>

  Regarding the second topic – the value of Big Research's corporate opportunities – Ms. Smith testified that Prosper may have received benefits by using Big Research's revenue-sharing agreements and trademarks.  Regarding the revenue-sharing agreements, she described one such agreement – the MediaPlanIQ agreement – which provided that Big Research was entitled to a certain percentage of revenues from the sale of its product when made in conjunction with the sale of other products offered by Prosper.  However, in the actual sales contracts with customers for items covered by that agreement, each item being sold was not separately priced.  Rather, the contracts show a total price for all items (both Big Research and Prosper products) which were bundled together.  Ms. Smith explained that in order to determine whether a fair percentage of the sales revenue was allocated to Big Research in instances where its products were bundled with Prosper products, she would need to determine what Prosper charged for its products when they were not bundled.  In response to questioning by the Court, Ms. Smith indicated that she was not sure whether looking at a sample of sales of unbundled products would suffice in this case because each case is different, so, ideally, she would like to see records of all the sales of the unbundled products for the time period when Prosper was selling those products in conjunction with Big Research products. (7/27/12 Tr. at 109:10-110:10.)

Ms. Smith also testified that she would need to look at Prosper's books and records to see if Prosper generated revenue from the use of Big Research's trademarks and, if so, how much. In particular, she testified that she would need Prosper's tax returns, general ledger, financial statement, payroll records, customer information including accounts receivables and invoices and customer contracts, and accounts payable information to make this determination.

### C.  <u>Fees and Charges</u>

Regarding the third and final topic - the accuracy and reasonableness of fees and charges between Big Research and Prosper – Ms. Smith testified that the payments reflected in the books and records of Big Research raised a red flag in her mind because the amount of payments from Big Research to Prosper more than doubled following the arbitration award.  She testified that in order to determine whether the increase in payments was reasonable, she would need to review Prosper's books and records which supported the amounts charged to Big Research for various services provided by Prosper – specifically the categories of documents identified in her May 1st letter.  (7/27/12 Tr. at 34:6-35:13.)  She further testified that she intended for her May 23rd letter to provide "specific examples of what [she] had already asked for in the May 1st letter."  (7/27/12 Tr. at 32:10-11.)  The May 23rd letter dealt "primarily with [this] third category . . . the appropriateness and reasonableness of the fees back and forth between the companies." (<u>Id</u>. at 33:3-9.)  She testified that the chart on page 4 of her May 23rd letter probably has listed all of the categories of expenses regarding which she would need further data from the Prosper documents. (<u>Id</u>. at 39:6-12.)  However, on cross examination she clarified that the chart "is a pretty thorough list, but [she is] not sure that it is 100 percent complete." (<u>Id</u>. at 63:8-14.)  Among other

records that she testified about, she noted heavy redactions in certain of the billing records provided relating to legal fees. (Id. at 42:24-45:25.)

As a general matter, Ms. Smith testified that the reason she needs to see the records of Prosper and the Prosper-related entities is because Prosper's finances were commingled with Big Research's.  By way of example, she testified that Big Research's books and records included American Express bills that were heavily redacted, but that certain of the 2008 bills that were not redacted demonstrated that Big Research paid American Express bills in their totality even though those bills included Big Research charges, Prosper charges, and some personal expenses for an employee of Prosper.  In light of the commingling of the finances, the Big Research documents tell only part of the story. She testified that "it is very easy to come to the wrong conclusions when you are given only pieces of information.  It is very important from a financial analysis standpoint to have the full picture."  (7/27/12 Tr. at 35:18-21.)  For that reason, as an accountant, she would prefer to see more information rather than less information.  She conceded that the total universe of documents that she has identified needing would ultimately contain some irrelevant information, but she noted that it would be dangerous to look at one account or transaction in isolation. (Id. at 104:11-105:13.)

IV.

Before beginning to analyze the issues in terms of whether Prosper has produced all of the information to which Penn is reasonably entitled, the Court will address Prosper's argument that the motion to compel is procedurally improper and in violation of the Court's May 2, 2012 order.

Plaintiffs' position is that they complied with the Court's order by providing two documents to counsel for defendants – the

-10-

May 1st letter and the May 23rd letter - which, taken together, were the complete list of additional items Plaintiffs were requesting along with the justification for their requests. However, Defendants' position is that they understood the May 23rd letter alone to be the complete list of additional items that Plaintiffs were requesting pursuant to the Court Order. Because Defendants produced the items specifically identified in the May 23rd letter, (see 7/27/12 Tr. at 82:11-83:5, 86:1-20), they contend that Plaintiffs are not entitled to any additional relief.  The Court chooses to resolve the issues presented on substantive rather than procedural grounds, and will turn to the merits of the motion.

V.

A.  Attorney Eyes Only Documents

The first issue that the Court must decide is whether Ms. Smith may review certain records produced by Defendants and designated as "Attorney Eyes Only."  The terms of the Agreed Protective Order permit specially-retained consultants who are providing services for the prosecution or defense of this matter to view such records as long as they are advised of the provisions of the Order before viewing such records and are instructed to comply with it.  There is no question that Ms. Smith has been retained by Penn for the prosecution of this matter.  Indeed, Defendants elicited testimony that she has billed Penn and that Penn has paid her for her services.  The only dispute is whether the fact that Plaintiffs have identified her as a fact witness precludes her from viewing Attorney Eyes Only documents.

It could certainly be the case that a party might try to evade the purpose of the Protective Order by, for example, designating an employee of a party as a "consultant."  That type of subterfuge would likely be precluded by the language of the

-11-

Protective Order identifying a consultant as "specially-retained." Here, there is no indication that Ms. Smith's designation as a consultant would be problematic or would threaten the purposes of the Protective Order. The undisputed testimony at the hearing was that Ms. Smith does not compete with Defendants in any way and did not even know Defendants or Penn prior to being retained in this action. Furthermore, Ms. Smith testified credibly and without contradiction that she has experience protecting the confidentiality of her clients and their competitors and has done so in every instance, that she herself has confidentiality standards that she must adhere to, and that she has agreed to abide by the protective order in this case. All of the arguments that Defendants have raised go to the propriety of her testifying as a fact witness, a question that is not presently before the Court, and not the propriety of her reviewing the Attorney Eyes Only documents pursuant to the terms of the Protective Order. The Court finds that, so long as she complies with the requirements of paragraph 8.a. and has signed an "Agreement to be Bound by the Agreed Protective Order," Ms. Smith may view Attorney Eyes Only Materials pursuant to the terms of the Agreed Protective Order.

B. <u>Discovery from Prosper and Prosper-Related Entities</u>

The second issue before the Court is whether Plaintiffs are entitled to review books and records of defendant Prosper and certain related companies (assuming that Prosper has control over those companies' records) that are not Defendants in this case and, if so, the scope of any such discovery. The tension at the heart of this dispute is the tension in nearly every discovery dispute between the broad scope of discovery set forth in Rule 26(b)(1) and the limitations designed to prevent the burden or expense of the proposed discovery from outweighing its likely benefit, which are set forth in Rule 26(b)(2).

Here Plaintiffs have presented credible evidence that they have not gotten all of the information they need to put a value on their various claims.  At the same time, Ms. Smith has acknowledged that the broad discovery that plaintiffs seek includes information that is irrelevant.  Further, the Court is very reluctant, in a case like this, which involves a number of discrete claims rather than any claims which carry with them the right to conduct a complete audit of an opposing party's business activities, to allow such a wholesale audit to take place.  Accordingly, the Court will attempt to set forth with some specificity the discovery from Prosper's business records to which plaintiffs are reasonably entitled.  The Court will consider the testimony of Ms. Smith and the letters to which she referred during her testimony as setting forth the discovery at issue.

Regarding the first category of discovery about which Ms. Smith testified – the value of the assets that Prosper acquired from Big Research in mid-2010 – Plaintiffs are entitled to certain discovery relating to the gross revenues and associated expenses that are attributable to assets acquired by Prosper from Big Research.  Plaintiffs indicate that Prosper acquired the assets, so this first category seemingly applies to defendant Prosper alone.  (See, e.g., Pls.' Mot. Compel at 6-8.)  However, plaintiffs state that Defendants produced portions of the general ledger of a "Prosper affiliate" known as Consumer Research Partners, LLC, from June 2010 through December 31, 2011.  (Id. at 9.)  Those portions of the general ledger credit that entity "with all of the custom and syndicated research revenue associated with the 'Big Research®' and 'Big Insight' contracts that Defendants simultaneously produced." (Id.)  In the next line, Plaintiffs refer to that ledger as a "Prosper" ledger. (Id.)  Because discovery requests require a defendant to produce

-13-

documents that are in its "possession, custody or control," the discovery ordered below might well require Defendant Prosper to produce records from Consumer Research Partners, LLC. (See F.R. Civ. P. 34(a)(1).)

Ms. Smith testified that she is trying to determine (1) whether Prosper paid a fair price for the two assets that it did purchase (the email list and equipment), which she would determine by calculating the net revenues derived from those assets; and (2) what net revenue was generated from the other Big Research assets that Prosper did not formally purchase but that appear nevertheless to have been acquired by Prosper. Therefore, to the extent that this information has not been produced thus far,[1] the Court finds that Defendants should produce the following documents:

Relating to shared or acquired customers:

information from the general ledger(s) sufficient to show all revenues from May of 2010 through August of 2011 from any customers that were customers of Big Research at any time;

all customer invoices, receivable records, or other supporting documents from May of 2010 through August of 2011 associated with such revenues;

portions of its general ledger(s) showing all expenses associated with the generation of such revenues; and

all accounts payable invoices, payable records, or other supporting documents associated with such

---

[1]The Court understands that some of the items identified below have already been produced. Counsel for Defendant Prosper avers that Prosper has produced "portions of the Prosper Companies' general ledgers that identify the date, customer, amount, and general nature (syndicated or custom)" of the survey-related revenue received by the Prosper Companies from 2008-2011 along with "copies of the invoices and contracts with the third-parties that generated that revenue." (Defs.' Mem. Contra at 13 & Exh.2 (Clifford Decl.) at ¶3.)

expenses.

Relating to new customers:

documents showing all revenue received by Prosper from May of 2010 through August of 2011 from any customers that were new to Prosper during that time period but which came from Big Research's email list;

all customer invoices, receivable records, or other supporting documents from May of 2010 through August of 2011 associated with such revenues;

portions of the general ledger(s) sufficient to show all expenses associated with the generation of such revenues; and

all accounts payable invoices, payable records, or other supporting documents associated with such expenses.

Relating to Big Research's non-customer assets:

financial documents relating to Prosper's purchase of Big Research's equipment, including documents relating to the valuation of Big Research's equipment;

to the extent not produced in response to one of the categories listed above, information from the general ledger(s) sufficient to show all revenues from May of 2010 through August of 2011 that were generated from any of Big Research's non-customer assets;

all customer invoices, receivable records, or other supporting documents from May of 2010 through August of 2011 associated with such revenues;

information from the general ledger(s) sufficient to show all expenses associated with such revenues; and

all accounts payable invoices, payable records, or other supporting documents associated with such expenses.

Plaintiffs cite to Ms. Smith's May 23rd letter to describe her need to "determine if there are any normalizing adjustments which must be made, in accordance with generally accepted

-15-

valuation methodologies." (Pls.' Mot. Compel at 18.)  Because Plaintiffs will be valuing the assets of Big Research and not valuing Prosper as a whole, it seems that any normalizing adjustments should relate to the revenues and expenses associated with such assets and do not justify opening up Prosper's books and records in their entirety.

Before turning to the second category of documents described by Ms. Smith, the Court will address discovery relating to trademarks, because it straddles several categories.  While Ms. Smith testified about Prosper's use of Big Research's trademarks as part of her second category of documents relating to the value of Big Research's corporate opportunities, it appears that the discovery relevant to assessing the value of the trademarks would be captured by the discovery relating to the first and third categories of documents described by Ms. Smith.  Ms. Smith testified that she would need to look at Prosper's books and records to see if Prosper generated revenue from Big Research's trademarks and, if so, the business value of the trademarks. According to the evidence presented by Plaintiffs, Prosper may have generated such revenue in two ways: (1) from a fee charged to Big Research for its use of the trademarks and (2) from customer revenues based on Prosper's own use of the trademarks.

First, Plaintiffs argue that while Big Research was still operating, Prosper registered certain trademarks that were corporate opportunities for Big Research.  Based on the evidence Plaintiffs have presented, it appears that beginning in the third quarter of 2008, Prosper began charging Big Research 8% of Big Research's revenues for its "Use of Intellectual Property." (Pls.' Mot. Compel, Exh. 3C at 9.)  The documentation sought in connection with that 8% fee is discussed by Ms. Smith in connection with the third category of documents that she described (documents relating to the accuracy and reasonableness

-16-

of fees and charges between Big Research and Prosper and Prosper-related entities), and accordingly, that documentation will be discussed below in the context of the third category of documents.

Second, Plaintiffs have also presented evidence that at some point Prosper itself began using the trademarks at issue. Plaintiffs cited to contracts that customers entered into after mid-2010 in which the contracts are signed on behalf of "Big Research®" and a note below the signature states that "Big Research is a registered trademark of Prosper Business Development Corp.  Services will be delivered by Prosper and/or a Prosper affiliated entity." (Pls.' Mot. Compel, Exh. 4.)  To the extent that Prosper benefitted from its use of that trademark or the other trademarks at issue, the benefit would have been in the form of customer revenues, and discovery relating to such customer revenues has been ordered in connection with the first category of documents.

Turning now to the second category of documents about which Ms. Smith testified – the value of Big Research's corporate opportunities – Plaintiffs have argued that they need to test the reasonableness of certain prices charged where Prosper products were bundled with Big Research assets pursuant to revenue-sharing agreements.  This Court finds that Plaintiffs are entitled to a sample of documents sufficient to test the reasonableness of such prices.  Therefore, to the extent that this information has not already been produced, Defendants should produce the following discovery:

> For each Prosper product or service that was sold
> to customers both together with and separate from
> Big Research assets, a sample of documents from
> the relevant time period reflecting the price that
> charged for the Prosper product or service when
> sold alone. This sample shall be made up of the
> lesser of 20 randomly-chosen instances or all

-17-

instances in which each such Prosper product or
service was sold alone.

Regarding the third category of documents about which Ms.
Smith testified - the accuracy and reasonableness of fees and
charges between Big Research and Prosper and Prosper-related
entities – Ms. Smith testified that the chart on page 4 of her
May 23rd letter probably listed all of the categories of expenses
regarding which she would need further data from the Prosper
documents.  (Id. at 39:6-12.)  While she also testified that
there may be other categories not reflected in that letter,
Plaintiffs have not presented evidence of any additional
categories.

In her May 23rd letter, Ms. Smith set forth in detail
additional documents she needed in order to determine whether
those categories of expenses were appropriate and reasonable.
Plaintiffs have presented no evidence to support a need for
documents other than those identified in that letter in order to
analyze the accuracy and reasonableness of fees and charges
between Big Research and Prosper.  The parties have indicated
that, other than a dispute regarding the redaction of certain
documents produced, Defendants have produced the documents
requested in the May 23rd letter, and it does not appear that
Plaintiffs' motion to compel is seeking the documents identified
in the May 23rd letter.  (See 7/27/12 Tr. at 82:11-83:5, 86:1-
20.)  However, as a general matter, in light of the evidence of
commingling of records and finances between Big Research and
Prosper, Defendants should produce the following discovery to the
extent that this information has not already been produced:

from January 1, 2008 through December 31, 2011,
information from Prosper's general ledger
sufficient to show all payments that Prosper made
or owed to Big Research, as well as all payments
that Prosper made or owed to some other entity on

-18-

behalf of Big Research;

all accounts payable invoices, payable records, or other supporting documents associated with such payments;

from January 1, 2008 through December 31, 2011, information from Prosper's general ledger sufficient to show all income and receivables that Prosper received or was owed from Big Research, as well as all income and receivables that Prosper received or was owed from some other entity on behalf of Big Research; and

all customer invoices, receivable records, or other supporting documents associated with such accounts income and receivables.

### C.  Redactions of Legal Bills

The final issue that the Court will consider here is whether certain legal bills that have already been produced need to be produced in an unredacted or less redacted form.  Some discussion is required to pinpoint in particular which documents are at issue.  Plaintiffs' Motion complains that Defendants have refused to provide any unredacted bills (Pls.' Mot. at 11), and their reply gives examples of certain bills that have not been produced or have been produced but are "wholly redacted."  (Pls.' Reply at 25.)  In particular, Plaintiffs' reply complains about retention agreements and invoices from Baxter and Arnold and Isaac Brandt.  (Id.)  At the hearing it became clear that at least some of the invoices of both Baxter and Issac Brandt have been produced by those law firms.  (See Hearing Exhs. D-1, D-2.)  These records have some redactions but are not "wholly redacted."  (See Id.)  Plaintiffs have not pointed to any inappropriate redactions in those records, and it appears that those are not the records with which they are really concerned.  (See, e.g., 7/27/12 Tr. at 97:24-98:3.)  Rather, Plaintiffs seek to compel production of unredacted versions of other legal bills containing the broad-brush redactions of the sort made in Hearing Exhibit P3.6.

-19-

(7/27/12 Tr. at 42:24-45:25.)

Regarding the records that Plaintiffs claim were "wholly redacted," which appear to include at least the bills involving legal work by Gordon P. Shuler and legal work by James E. Arnold & Associates, LPA, Defendants have claimed that those redactions are appropriate assertions of attorney-client privilege and the work product doctrine because they were descriptions of work done on behalf of "Big Research and/or the other Defendants" in litigation where Penn was adverse to Big Research and Prosper. (Defs.' Mem. Contra at 21.)  The Declaration of Damion M. Clifford, counsel for Prosper, swore that the redacted legal bills produced by Defendants contained "attorney-client communications, attorney work-product, and detailed, itemized descriptions of legal work performed on behalf of" Drenik, Rist, and/or Prosper Business in litigation against Penn, LLC and/or Steve Denari and on behalf of Big Research in litigation against Penn, LLC.  (Defs.' Mem. Contra, Exh. 2 at ¶7.)

The parties cite to federal and state law without addressing which applies.  In a case where jurisdiction is based on a federal question, the existence of pendent state law claims does not relieve the Court of the "obligation to apply the federal law of privilege." Hancock v. Dodson, 958 F.2d 1367, 1373 (6th Cir. 1992).  However, because the only federal claim in this case has been dismissed, all of the privilege questions relate to state-law claims.  Accordingly, there is some basis for arguing that the question of privilege is governed by Ohio law. See Maday v. Pub. Libraries of Saginaw, 480 F.3d 815, 821 n.2 (6th Cir. 2007) (citing Fed. R. Evid. 501).  As discussed below, however, the Court would reach the same conclusion under state or federal law.

First the Court considers whether Defendants should be prevented from invoking the privilege against Plaintiffs because

Penn is a Member of Big Research.[2]  The attorney-client privilege "extends to corporations, but it is not absolute." <u>Fausek v. White</u>, 965 F.2d 126, 132 (6th Cir. 1992).  "There is a mutuality of interests between a corporation and its shareholders that precludes use of the privilege by management to deprive shareholders of information relating to their investments in the corporation." <u>Id</u>. (citing <u>Garner v. Wolfinbarger</u>, 430 F.2d 1093, 1103 (5th Cir. 1970)).  Accordingly, "when shareholders present a colorable claim of fraud . . . that is inimical to their interests as shareholders, they must be given an opportunity to establish good cause why the attorney-client privilege should not be invoked in their particular case." <u>Fausek</u>, 965 F.2d at 132-33.

Defendants argued that <u>Garner</u> is inapplicable here. Defendants cited to a line of cases in the Delaware Chancery Courts holding that the mutuality of interest described in <u>Garner</u> will have lapsed by the time the corporation and the shareholder can reasonably anticipate litigation about a particular dispute. (Defs.' Mem. Contra at 21-22.)  Those cases are not binding on this Court, but the Court considers their reasoning, which is articulated by the Court of Chancery as follows:

> Before the Court considers whether a showing of good cause compels production of purportedly privileged documents, however, the "litigant [must] first establish that a mutuality of interest existed between the parties" at the time the disputed communication was made. This mutuality of interest exists when a fiduciary (such as a corporate director) seeks legal

---

[2]Plaintiffs also seem to argue that Defendants cannot assert the privilege because Big Research was named as a Plaintiff in light of the fact that Penn is bringing this as a derivative action.  That argument fails under <u>Garner v. Wolfinbarger</u>, 430 F.2d 1093 (5th Cir. 1970), which also involved a shareholder derivative suit, and still required the plaintiffs to show good cause in order to prevent the application of the privilege.

advice in connection with actions taken or contemplated in his role as a fiduciary. Because the director is obligated to act in the best interest of the corporation and its shareholders, there is a mutuality of interest among the director, the corporation, and the shareholders when such legal advice is sought. It is logical, therefore, that upon a showing of good cause, the attorney-client privilege does not attach to prevent a plaintiff-shareholder-for whose ultimate benefit that advice was sought-from discovering the contents of that communication. At the point in time when the interests of the fiduciary and the beneficiary diverge, however, there is no longer a mutuality of interest and a Garner analysis is not appropriate. Although there is little Delaware case law on the subject, and no bright-line rule that identifies the point in time when mutuality of interest diverges in each case, that divergence must necessarily occur at the point in time when the parties can reasonably anticipate litigation over a particular action.

In re Fuqua Indus., Inc., CIV.A. 11974, 2002 WL 991666, *3 (Del. Ch. May 2, 2002) (citations omitted).  Whether anticipation of litigation excepts communications from Garner, as the Delaware Chancery Court suggests, or whether it factors into the good cause analysis set forth in Garner, Plaintiffs have not demonstrated that the privilege should be inapplicable here.

Plaintiffs have not discussed the good cause factors set forth in Garner and Fausek, but weighing those factors demonstrates that good cause is absent in this case.  While Penn certainly has a financial interest in whether Big Research was properly paying certain bills including legal bills, that interest cannot be a backdoor means to access otherwise privileged information regarding litigation in which Penn is and has been adverse.  Several of the "good cause" indicia, including "the apparent necessity or desirability of the shareholders having the information," weigh against preventing any assertion of the privilege.  Plaintiffs do not claim that they need to know the substance of attorney-client communications regarding the

litigation – rather they merely wish to test the propriety of certain legal fees being charged to or reimbursed by Big Research.  In fact, the question at issue is not really a question of whether Defendants should be barred from asserting the privilege but rather whether Defendants asserted it properly. This Court finds that, while Defendants may assert the attorney-client privilege, they have not asserted the privilege properly here.

The attorney-client privilege does not require redaction of all detail in the billing records.  It is not unusual for parties to an action to seek reimbursement of legal fees either pursuant to an agreement or pursuant to statutory authorization of attorney fee awards.  Where a party seeks statutory attorney fees in a legal action, "the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation."  Corbis Corp. v. Starr, 719 F. Supp. 2d 843, 844 (N.D. Ohio 2010) (quoting Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 553 (6th Cir. 2008) (internal citation and quotation omitted)). "[S]tatements regarding generally what counsel did for a specific period of time (i.e., 'prepared summary judgment reply') are not privileged or work product." Corbis Corp., 719 F. Supp. 2d at 846 n.4.  If certain portions of statements are privileged or protected by the work-product doctrine, the party claiming that privilege bears the burden of establishing that it applies.  Id. at 846 (citations omitted).  While redactions to protect attorney-client privilege and attorney work product may be appropriate, it would be an unusual case where all billing details were privileged.  See, e.g, Libertarian Party of Ohio v. Brunner, No. 2:04-CV-08, 2007 WL 4171630, *3 (S.D. Ohio Nov. 20, 2007) (discussing the grey

-23-

area between detailed billing records that disclose substance
that would be privileged and ones that are general enough to
"enable the Court to determine that the time was reasonably spent
in pursuit of necessary and relevant interests" without revealing
privileged information).

Defendants cite to <u>State ex rel. Dawson v. Bloom-Carroll
Local School Dist.</u>, 131 Ohio St.3d 10, 15-16, 959 N.E.2d 524,
529-30, 2011-Ohio-6009, ¶28 (Ohio 2011), to support non-
disclosure of all narrative portions of attorney-fee statements,
but that case applies specifically to whether certain records are
exempt from disclosure under the Public Records Act and not the
propriety of withholding detailed descriptions of billing records
in discovery.  In discovery disputes, a blanket assertion of
privilege regarding attorney fee bills is typically not
appropriate.  <u>See, e.g.</u>, <u>Muehrcke v. Housel</u>, No. 85643, 85644,
2005 WL 2593551, *3, 2005-Ohio-5440, ¶¶17-20 (Ohio Ct. App.
Cuyahoga Cty. Oct. 13, 2005); <u>see cf.</u> <u>Shell v. Drew & Ward Co.,
L.P.A.</u>, 178 Ohio App. 3d 163, 169-70, 897 N.E.2d 201, 206-07
2008-Ohio-4474, ¶¶25-29 (Ohio Ct. App. Hamilton Cty. Sept. 5,
2008) (holding that billing records in that case were "extremely
detailed" and were protected by attorney-client privilege and
should be produced in redacted form).  However, billing records
reflecting, for example, calls made with opposing counsel would
certainly not be privileged under either state or federal law.

Here, Defendants, as the party seeking to exclude all of the
itemized descriptions of legal work for certain legal bills, have
not met their burden of demonstrating that the privilege applies
to everything on those bills.  Defendants shall produce those
bills again, but shall redact them only to exclude descriptions
that would reveal privileged attorney-client communications or
matters that are protected by the work product doctrine.

VI.

For the foregoing reasons, Plaintiffs' Motion to Compel is granted in part and denied in part, as follows:

1.  Ms. Smith may view Attorney Eyes Only Materials pursuant to the terms of the Protective Order so long as she complies with the requirements of paragraph 8.a. and has signed an "Agreement to be Bound by the Agreed Protective Order."

2.  To the extent that this information has not been produced thus far,[3] the Court finds that Defendants should produce the following documents:

Relating to shared or acquired customers:

> information from the general ledger(s) sufficient to show all revenues from May of 2010 through August of 2011 from any customers that were customers of Big Research at any time;

> all customer invoices, receivable records, or other supporting documents from May of 2010 through August of 2011 associated with such revenues;

> portions of its general ledger(s) showing all expenses associated with the generation of such revenues; and

> all accounts payable invoices, payable records, or other supporting documents associated with such expenses.

Relating to new customers:

> documents showing all revenue received by Prosper from May of 2010 through August of 2011 from any customers that were new to Prosper during that time period but which came from Big Research's email list;

> all customer invoices, receivable records, or other supporting documents from May of 2010 through August of 2011 associated with such revenues;

> portions of the general ledger(s) sufficient to

---

[3]The Court understands that some of the items identified below have already been produced.

show all expenses associated with the generation of such revenues; and

all accounts payable invoices, payable records, or other supporting documents associated with such expenses.

Relating to Big Research's non-customer assets:

financial documents relating to Prosper's purchase of Big Research's equipment, including documents relating to the valuation of Big Research's equipment;

to the extent not produced in response to one of the categories listed above, information from the general ledger(s) sufficient to show all revenues from May of 2010 through August of 2011 that was generated from any of Big Research's non-customer assets;

all customer invoices, receivable records, or other supporting documents from May of 2010 through August of 2011 associated with such revenues;

information from the general ledger(s) sufficient to show all expenses associated with such revenues; and

all accounts payable invoices, payable records, or other supporting documents associated with such expenses.

Relating to products that were bundled:

for each Prosper product or service that was sold to customers both together with and separate from Big Research assets, a sample of documents from the relevant time period reflecting the price that was charged for the Prosper product or service when sold alone. This sample shall be made up of the lesser of 20 randomly-chosen instances or all instances in which each such Prosper product or service was sold alone.

Relating to potential commingling of funds between companies:

from January 1, 2008 through December 31, 2011, information from Prosper's general ledger sufficient to show all payments that Prosper made

-26-

or owed to Big Research, as well as all payments that Prosper made or owed to some other entity on behalf of Big Research;

all accounts payable invoices, payable records, or other supporting documents associated with such payments;

from January 1, 2008 through December 31, 2011, information from Prosper's general ledger sufficient to show all income and receivables that Prosper received or was owed from Big Research, as well as all income and receivables that Prosper received or was owed from some other entity on behalf of Big Research; and

all customer invoices, receivable records, or other supporting documents associated with such accounts income and receivables.

3.  Defendants shall re-produce versions of the legal bills it produced, redacted only to exclude descriptions that would reveal privileged attorney-client communications or matters that are protected by the work product doctrine.

Defendants have 14 days from the date of this Order to produce the additional documents required.  All documents shall be produced in accordance with Fed. R. Civ. P. 34(b)(2)(E) to the extent possible.

VII.

Any party may, within fourteen days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge.  28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 91-3, pt. I., F., 5.  The motion must specifically designate the order or part in question and the basis for any objection. Responses to objections are due fourteen days after objections are filed and replies by the objecting party are due seven days thereafter. The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

    This order is in full force and effect, notwithstanding the filing of any objections, unless stayed by the Magistrate Judge or District Judge. S.D. Ohio L.R. 72.3.

                         /s/ Terence P. Kemp
                         United States Magistrate Judge